**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

United States of America,      )   CR 05-920-RSWL
                               )
            Plaintiff,         )   ORDER **GRANTING IN PART**
                               )   **AND DENYING** IN PART
     vs.                       )   DEFENDANTS' MOTIONS
                               )
MICHAEL DENNIS WILLIAMS, et    )
al.,                           )
                               )
            Defendants.        )
_____)

    On December 16, 2008, various Motions filed by
Defendant Michael Dennis Williams and Defendant Antoine
Lamont Johnson came on for regular calendar before this
Court.  Plaintiff, United States of America, appeared
through its counsel of record, Assistant United States
Attorneys Elizabeth Yang and Karen Meyer.  Defendant
Johnson appeared with his counsel of record, Amy Jacks
and Richard Lasting.  Defendant Williams appeared with

his counsel of record, Marcia Morrissey and Lynne

Coffin.  The matters were submitted, and the Court

having considered all papers and arguments, **NOW FINDS**

**AND RULES AS FOLLOWS:**


1.   <u>Defendant William's Motion to Exclude or Limit
     "Gang" Testimony, to Compel Compliance with Federal
     Rule Evidence 404(b) and/or 702; and Motion for a
     Daubert Hearing [617]</u>

The Court **DENIES** Defendant William's Motion to

Exclude or Limit "Gang" Testimony, to Compel Compliance

with Federal Rule Evidence 404(b) and/or 702; and Motion

for a Daubert Hearing.


     A.   <u>The Government Has Not Violated the Notice
          Requirements of Federal Rule of Evidence 404(b)
          Because Evidence of Gang Membership in this
          Case Does Not Qualify As "Other Crimes, Wrongs,
          or Acts."</u>


The Government has not violated the notice

requirements of Federal Rule of Evidence 404(b) because

evidence of gang membership in this case does not

qualify as "other crimes, wrongs, or acts."  If evidence

of an act is inextricably intertwined with the crime

charged, it is not considered "other acts" evidence.

<u>United States v. Williams</u>, 291 F.3d 1180-89 (9th Cir.

2002) (quoting <u>United States v. Vizcarra-Martinez</u>, 66

F.3d 1006, 1012-13 (9th Cir. 1995)).  Evidence is

"inextricably intertwined" if it "constitutes a part of

1  the transaction that serves as the basis for the

2  criminal charge" or "[is] necessary to ...permit the

3  prosecutor to offer a coherent and comprehensible story

4  regarding the commission of the crime." United States

5  v. Vizcarra-Martinez, 66 F.3d 1006, 1012-13 (9th Cir.

6  1995).

7

8     Where evidence of gang affiliation is probative of

9  the crime charged, it is not Rule 404(b) evidence. See

10 United States v. Santiago, 46 F.3d 885 (9th Cir. 1995)

11 (finding that evidence of gang affiliation did not

12 qualify as "other crimes" evidence subject to Rule

13 404(b) where it provided a motive for the crime); United

14 States v. Easter, 66 F.3d 1018, 1021-22 (9th Cir. 1995)

15 (finding that evidence of the defendant's gang

16 affiliation was not Rule 404(b) evidence where it

17 related to the identity of the perpetrator for the

18 charged crimes).

19

20    Here, similarly to Santiago and Easter, the

21 Government is introducing evidence of Defendant's gang

22 affiliation for its probativeness of the crime charged.

23 The Government intends to introduce the evidence to

27 explain who was involved in the planning of the crime as

28 well as its execution.  [Opposition at 8].  The

   Government has alleged that it will elicit such

   information to explain the defendants' relationships to

3

one another and with the witnesses.  [Id.].
Additionally, the evidence is necessary to give context
and coherency to the Government's story of the crime.
Without the context of the defendants' affiliation with
the Hoovers, the narrative will be fragmented as jurors
must speculate as to why defendants would band together
seemingly for no reason to commit a robbery and why
defendants William and Johnson would admit their
participation in a heinous crime to Witness 1.


       B.   <u>The Admissibility of Expert Gang Testimony,</u>
           <u>Compliance with Rule 702, Rule 704(b), and</u>
           <u>Motion for a Daubert Hearing</u>


    The Government has stated that it does not intend
to call any expert witnesses with respect to Defendant's
gang affiliation.  [Opposition at 2, n.1].  Therefore,
to the extent Defendant's Motion addresses the use of
expert testimony, Federal Rule of Evidence 702, and a
Daubert Hearing, it is **DENIED WITHOUT PREJUDICE.**
///
///


       C.   <u>The Government's Introduction of Testimony</u>
           <u>Regarding Defendant's Gang Membership is</u>
           <u>Relevant Under Rule 401 and Should Not be</u>
           <u>Excluded Under Rule 403 as Unduly Prejudicial.</u>

    "[E]vidence of gang affiliation is admissible when
it is relevant to a material issue in the case."  <u>United</u>

4

1 States v. Easter, 66 F.3d at 1021.  However, Federal
2 Rule of Evidence 403 ("Rule 403") states, "Although
3 relevant, evidence may be excluded if its probative
4 value is substantially outweighed by the danger of
5 unfair prejudice..."  Fed. R. Evid. 403.

7 The Government is not introducing gang affiliation
8 evidence to show Defendant's motive or intent.  The
9 Government has stated that it intends to use evidence of
10 Defendant's gang affiliation because it is probative of
11 the participants' identities, their relationships among
12 each other and witnesses, and their conduct pertaining
13 to the charged crimes.  [Opposition at 10].  For
14 example, the Government will use gang affiliation
15 evidence to prove defendants were present at a planning
16 meeting before the robbery.  [Id.].  The Government
17 argues that without the context of Defendant's
18 association with the Hoovers, the jury will be confused
19 about why Defendant would seemingly for no reason band
20 together with the others to commit the robbery and why
21 he would make incriminating statements to Witness 1.
22 Additionally, the jury will be confused about why
23 Defendant is referred to by a moniker without some
27 explanation about how they are used by the Hoovers.  As
28 shown above, The Government has shown that the gang
affiliation evidence is relevant under Federal Rule of
Evidence 401 because it is relevant to the identities of

1 the robbery participants and how the participants and

2 witnesses know each other.  See Easter, 66 F.3d at 1021

3 ("evidence tending to show identity, such as the gang-

4 related connections between the defendants, the

5 mastermind of the crime, and the getaway car, was very

6 probative".

7

8     Any potential prejudice to Defendant can be

9 minimized by appropriate steps taken by this Court.  For

10 example, in Easter, the Ninth Circuit found that the

11 Court's steps to minimize any potential prejudice

12 rendered the gang affiliation evidence admissible under

13 Rule 403.  Here, the Government has offered to submit

14 proposed voir dire questions to screen for juror bias in

15 regards to gang affiliation, to propose a limiting

16 instruction for the jury that makes clear Defendant

17 should not be found guilty because of his gang

18 affiliation, that the evidence may only be considered as

19 it relates to Defendant's identity and conduct in this

20 case, and relationship to other defendants.  [Opposition

21 at 13].  Therefore, Defendant's Motion to exclude

22 evidence of Defendant's gang affiliation under Rule 403

23 is **DENIED**.[1]  However, the Government **SHALL** submit, at

27 _____

28       [1] The Court's denial of Defendant's Motion is based only on
the Motion pending before the Court.  The Court did not consider
Defendant's request that the Court order the Government to give
more specificity concerning how it intends to prove certain
information about the Hoovers or Defendant's gang affiliation.

the appropriate time, the proposed voir dire questions
and limiting instructions.

2.  Defendant Johnson's Motion to Adopt Co-Defendant's
    Motion to Exclude or Limit "Gang" Testimony [672]

     To the extent applicable, the Court **GRANTS**
Defendant Johnson's Motion to Adopt Defendant Williams'
Motion to Exclude or Limit "Gang" Testimony.

3.  Defendant Johnson's Motion to Dismiss Indictment for
    Government's Destruction of Exculpatory Evidence
    or, In the Alternative, to Suppress Secondary
    Evidence Relating to the Destroyed Evidence [632]

     After the robbery, Police officers recovered a knit
hat with dreadlocks attached ("rasta hat") from the
crime scene. They submitted it to criminalists from the
LAPD Scientific Investigation Division ("LAPD SID") for
examination.  Criminalists recovered twelve human hairs
from the rasta hat.  Four of the twelve hairs had root
tissue attached.  Those four hairs were subjected to
nuclear DNA testing.  Testing showed that three of the
four hairs did not contain sufficient material to yield
a conclusive result.  However, one of the four hairs was
later matched to Defendant Johnson.  During DNA testing
all four hairs were destroyed.  The other eight hairs
were preserved.

     Before testing, the criminalist made preliminary

notations suggesting that the four hairs varied in color and length.   However, the criminalist did not take any photographs of the hairs or examine them under a microscope to make further observations about their physical characteristics.

Defendant seeks to dismiss the Indictment against him or alternatively suppress any secondary evidence relating to the destroyed evidence.   The Court **DENIES** Defendant Johnson's Motion.

A.   <u>Defendant's Right to Due Process Was Not Violated by the Government's Destruction of Four Hairs Found in the Rasta Hat</u>

1.   <u>The Trombetta Test</u>

The Government has a constitutional duty to turn over exculpatory evidence that raises a reasonable doubt about the defendant's guilt.   <u>United States v. Agurs</u>, 427 U.S. 97, 112 (1976).   When the Government destroys or fails to preserve evidence in it's possession, there is only a due process violation if the evidence is material.   "...To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."   <u>California v. Trombetta</u>,

467 U.S. 479, 488-89 (1984). If the destroyed evidence is not "material," then there is only a denial of due process of law if "a criminal defendant can show bad faith on the part of the police..." Arizona v. Youngblood, 488 U.S. 51, 57 (1988).

In Arizona v. Youngblood, 488 U.S. 51 (1988), the Supreme Court dealt with the prosecution's failure to preserve semen samples. In that case, neither the prosecution nor the defense knew the test results of the semen samples. Id. at 56. The Court found that the unpreserved evidence did not meet the standard required by Trombetta because the "possibility that the semen samples *could have* exculpated [defendant] if preserved or tested is not enough to satisfy the standard of constitutional materiality." Id. (emphasis added). Furthermore, the Court reiterated that Trombetta requires the defendant to show that the police knew the semen samples would have exculpated him "before the evidence was destroyed." Id.

Similarly, in this case, the Government did not know of any exculpatory value of the four hairs before they were destroyed because they were consumed by the DNA testing before the Government knew the test results. This is similar to Youngblood where the police did not know the results of the DNA testing before destroying

9

them.  The only difference is that Defendant argues the
Government knew the DNA evidence could have exculpated
Defendant before destroying it because the criminologist
made notations about differing physical characteristics
of the twelve hairs.  However, the Government's
Opposition submits evidence explaining that the slight
differences in the physical characteristics of the hairs
would not give them reason to believe that the hairs
were deposited by different persons.  For example, the
Government has submitted the criminologist's report
noting the physical characteristics of the hair samples.
In that report, the criminologist notes that the hairs
range in color from light brown to very dark brown, and
some have roots while others have no follicular tissue.
[Opposition, Exhibit A].  However, Linda French, a
criminologist with the LAPD SID, states in her
declaration that the hairs of one person can exhibit
varying characteristics.  [French Decl. ¶ 3].

     Moreover, not knowing who the hairs came from, the
Government could not have known that the evidence would
exculpate Defendant.  At the time of testing, Defendant
was not even a suspect.  This case is distinguishable
from the case cited by Defendant, United States v.
Cooper, 983 F.2d 928 (9th Cir. 1993), where the
Government was specifically told and had reason to
believe that evidence seized from the specific defendant

was exculpatory, but destroyed it anyway.   Therefore, Defendant cannot carry his burden to show that the destroyed evidence had an "apparent" exculpatory value before it was destroyed.[2]

Even if the destroyed evidence had an apparent exculpatory value before it was destroyed, Defendant must show that he is "...unable to obtain comparable evidence by other reasonably available means." Trombetta, 467 U.S. at 488-89.

Here, the Government has given Defendant the eight remaining hairs found in the rasta hat for comparison with Defendant's hair.   The only apparent difference of the eight remaining hairs from the destroyed hairs is that the destroyed hairs had root tissue attached.

---

[2] Additionally, in examining a Fifth Circuit case that dealt with the destruction of evidence during DNA testing, the Fifth Circuit held that Trombetta does not even apply.   The Court found that evidence destroyed during necessary DNA testing is not "destroyed" in the "Trombetta sense" because there was "no evidence left for the state to preserve once [the doctor] had used up the sample." Garrett v. Lynaugh, 842 F.2d 113, 116 (5th Cir. 1988).   The Court also found that "Trombetta does not require a state to conduct its investigation in any particular way or perform tests on raw data in any particular order. Nor does it require a state to conduct additional or more comprehensive tests." Id.   The Ninth Circuit has agreed that "The Youngblood majority strongly disagreed that 'the Due Process Clause is violated when the police fail to use a particular investigatory tool.'" Paradis v. Arave, 954 F.2d 1483, 1488 (9th Cir. 1992) (quoting Youngblood 488 U.S. at 59).   The case at hand is similar because the hairs were consumed during DNA testing, leaving nothing to preserve.

Therefore, Defendant has access to comparable evidence by reasonably available means because he has the remaining eight hairs to test.  In fact, the Government's testing of these eight hairs reveals that they come from multiple sources.  [Opposition, Ex. F].  The Defense's main theory is that there were multiple sources of hair in the rasta hat because multiple persons wore the rasta hat.  Therefore, Defendant can still use the remaining hairs to support this theory and is thus able "to obtain comparable evidence by other

///

reasonably available means." Trombetta, 467 U.S. at 488-89.

   Based on the above, Defendant has not met his burden to show a due process violation under Trombetta.

##    2. The Youngblood Test

   If a defendant cannot meet the Trombetta test to show constitutional materiality of the destroyed evidence, there is only a denial of due process of law if a "defendant can show bad faith on the part of the police…" in failing to preserve the evidence. Youngblood, 488 U.S. at 57.

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at 56.  The Government's conduct does not indicate in any way that it believed or should have believed that the evidence could form a basis for exonerating Defendant because at the time of destruction Defendant was not even a suspect.  In fact, the Government did not intentionally destroy the evidence.  It was consumed by

the testing that sought to identify a suspect.

Moreover, failing to photograph or conduct microscopy before DNA testing did not violate the LAPD SID's standard operating procedures.  See United States v. Heffington, 952 F.2d 275, 280-81 (9th Cir. 1991) (finding that "a police department's compliance with "departmental procedure" should be regarded as an indication that the disposal of evidence was not performed in "bad faith").  Contrary to Defendant's assertion, the LAPD SID's standard procedures do not require photographing or conducting microscopy on hair samples.  [See Blanton Decl. ¶¶ 3-4; Opposition, Ex.

2].[3]  As cases above illustrate, this factors toward a finding of good faith.

Additionally, courts have consistently found no bad faith where evidence was destroyed during scientific testing.  See United States v. Stevens, 935 F.2d 1380, 1386-88 (3rd Cir. 1991) (no bad faith where saliva sample consumed during testing); Carlson v. State, 945 F.2d 1026, 1029 (8th Cir. 1991) (destruction of entire blood sample during prosecution testing did not violate due process).  See also, Garrett v. Lynaugh, 842 F.2d 113 (5th Cir. 1998) (finding that sample consumed during testing did not even qualify as "destroyed evidence" under Trombetta because testing was necessary and there was no evidence left to preserve after the test was conducted).  Here, the evidence was destroyed during scientific testing.[4]  Therefore, Defendant has not met

_____

[3] Defendant points out in Exhibit 2 to his Reply that Section 6.3.21 of the LAPD SID's standard operating procedures requires that 5-10 mm of hair be cut for testing, and any remaining hair be preserved.  There is no indication if the criminologists had remaining hair to preserve, or whether this rule was disregarded.  According to Blanton, the criminologists followed LAPD SID's standard procedures. [Blanton Decl. ¶¶ 3-4]. If the standard procedures were not followed, this would weigh against a finding of good faith.  However, even if true, the totality of the evidence does not indicate bad faith. Especially, since the purpose of testing the hair was to identify its depositor, not to destroy it.

[4] Defendant argues the Government should have photographed or conducted microscopy of the hairs.  However, Youngblood specifically states that there is no duty to perform a specific

his burden to show bad faith on the part of the Government, and Defendant's Motion to Dismiss the Indictment is **DENIED**.

B.   <u>Secondary Evidence Relating to the Destroyed Hairs Should Not be Suppressed</u>

"When primary evidence is destroyed and secondary evidence is used, the latter's admissibility at trial turns on a balancing test aimed at insuring a fair trial." <u>United States v. Lillard</u>, 929 F.2d 500, 504 (9th Cir. 1991) (citing <u>United States v. Loud Hawk</u>, 628 F.2d 1139, 1151 (9th Cir. 1979).  "The court must weigh the extent of the Government's culpability for the lost evidence and the degree of prejudice to the defendant." <u>Id.</u> at 504.

After examining the <u>Loud Hawk</u> factors, it is clear that the Government's conduct was reasonable.  Weighing in the Defendant's favor is only the fact that the evidence was destroyed while in the custody of federal officers.  However, as explained above under the <u>Youngblood</u> analysis, the Government did not act in disregard of the Defendant's interests.  The Government did not intentionally destroy the hairs; but rather, they were destroyed during testing that sought to

test.  <u>Youngblood</u> 488 U.S. at 59.

identify a suspect.  The Government's failure to
photograph or conduct microscopy on the hairs does not
violate it's standard operating procedures [Blanton
Decl. ¶¶ 3-4].  Furthermore, such tests had little or no
value to the investigation at the time of testing.[5]
[French Decl. ¶¶ 2, 4].  Lastly, none of the
Government's attorneys were involved in the testing or
destruction of the hair.  As these facts indicate, the
Government's actions were reasonable under the Loud Hawk
factors and weigh against suppressing the evidence.

In regards to prejudice to Defendant, the destroyed
evidence at issue is central to the case.  The one hair
identifying Defendant is allegedly the only piece of
physical evidence linking him to the robbery.  This is
substantial proof of his identity as one of the robbers.
The other three hairs are central to the case because
Defendant's main defense is that multiple persons wore
the rasta hat.

However, it is unlikely that Defendant is
prejudiced from the destroyed evidence for several
reasons.  First, the Government still has eight
remaining hairs found in the rasta hat.  The Government

_____
[5] There is little or no value in photographing the hair, and
microscopy is less accurate than DNA testing and cannot identify
a suspect. [French Decl. ¶¶ 2, 4].

has given these to Defendant for testing.  As stated

previously, some of  these hairs do not match Defendant.

Therefore, there is adequate substitute evidence to

support his theory that other persons wore the rasta

hat.  As for the three destroyed hairs that were

inconclusive, Defendant is free to argue to the jury

that they might have not matched as well.

Second, Defendant is not prejudiced by his

inability to conduct further testing on the

incriminating hair because the DNA extracted from that

hair is still available for testing and likely only to

further incriminate him.  Defendant is also free to

cross-examine the Government's witness as to the

reliability of the testing.  See also United States v.

Traylor, 656 F.2d 1326, 1335 (9th Cir. 1981) (finding no

prejudice to the defendant because he was not able to

conduct independent tests of the evidence where

secondary evidence was probative and reliable and

defendant cross-examined chemist about the testing).

Weighing the Government's culpability with any

prejudice to Defendant, this Court finds that Defendant

will still receive a fair trial.  The Government acted

reasonably and the prejudice to Defendant is minimal.

Therefore Defendant's Motion to Suppress Secondary

Evidence Relating to the Destroyed Evidence is **DENIED**.

4.  <u>Defendant Johnson's Motion to Traverse Search
    Warrant of March 18, 2005 [627]</u>

    Defendant Johnson's Motion to Traverse Search
Warrant of March 18, 2005 is **DENIED**.  On March 18, 2005,
Judge Fidler of the Superior Court issued a search
warrant for police officers to obtain a sample of
Defendant Johnson's blood and saliva.  Judge Fidler
found probable cause and issued the warrant based on the
affidavit of LAPD Detective Maria Tomes.


    A.  <u>Requirements for Franks Hearing</u>


    "[W]here the defendant makes a substantial
preliminary showing that a false statement knowingly and
intentionally, or with reckless disregard for the truth,
was included by the affiant in the warrant affidavit,
and if the allegedly false statement is necessary to the
finding of probable cause, the Fourth Amendment requires
that a hearing be held at the defendant's request."
<u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).  The
defendant is also "permitted to challenge a warrant
affidavit valid on its face when it contains deliberate
or reckless omissions of facts that tend to mislead."
<u>United States v. Stanert</u>, 762 F.2d 775, 781 (9th Cir.
1985).  A substantial preliminary showing does not
require clear proof of deliberate or reckless false
statements.  <u>United States v. Chesher</u>, 678 F.2d 1353,

1360 (9th Cir. 1982).  However, allegations that the "affidavit displayed a pattern of deliberate omission[s]," without further evidence, is insufficient to warrant a <u>Franks</u> hearing.  <u>United States v. Chavez-Martinez</u>, 306 F.3d 973, 979 (9th Cir. 2002).

"Not all information in the government's possession need be included in the warrant affidavit." <u>United States v. Garza</u>, 980 F.2d 546, 551 (9th Cir. 1992) (quoting <u>United States v. Johns</u>, 948 F.2d 599, 606 (9th Cir. 1991).  "Only if omitted facts 'cast doubt on the existence of probable cause' do they rise to the level of misrepresentation." <u>Id.</u>

The Court determines if the falsehood was necessary to the finding of probable cause by determining if there is probable cause on the face of the warrant after (1) deleting the falsity from the affidavit and (2) inserting the omissions which misled the Court.  <u>United States v. Ippolito</u>, 774 F.2d 1482, 1486-87 & n.1 (9th Cir. 1985).

B.  <u>Analysis</u>

1.  <u>Larry Jordan</u>

Defendant argues that Tomes made misleading omissions in regards to Larry Jordan's criminal history,

suspected involvement in the crime, and inconsistent
statements to the investigating officers.

Defendant does not meet the requirements entitling
him to a <u>Franks</u> hearing.  Defendant must show, "[T]he
affiant intentionally or recklessly omitted facts

required to prevent technically true statements in the
affidavit from being misleading." <u>Stanert</u>, 762 F.2d at
781.  In addition, the defendant must show that the
"affidavit, once corrected and supplemented," would not
"provide . . . a substantial basis for concluding that
probable cause existed" to search defendant's residence.
<u>United States v. Jawara</u>, 474 F.3d 565, 582 (9th Cir.
2007) (quoting <u>Stanert</u>, 762 F.2d at 782).

It is true that Tomes omitted Jordan's convictions
for various crimes ranging from involuntary
manslaughter, narcotics, and stealing.  However, Tomes
included in her affidavit that Jordan was <u>Mirandized</u>
prior to his interview.  The Ninth Circuit has stated
that an affidavit which states a person was <u>Mirandized</u>
makes clear that he is a suspect in the crime.  <u>See</u>
<u>Belmontes v. Brown</u>, 414 F.3d 1094, 1122 (9th Cir.
2005).  Thus, it is unlikely that Tomes was intending to
mislead the magistrate into believing that Jordan was an
upstanding citizen by not revealing his criminal history

because she included information that indicated he was a
suspect in the robbery and murder, and that his van was
used in the crime.  Additionally, Defendant has not made
any showing, other than a blanket assertion, that Tomes
made these omissions intentionally or with reckless

disregard for the truth.  Most importantly, omitting
Jordan's criminal history would not change the finding
probable cause because it would not change any
credibility issues in regards to Jordan because the
affidavit taken as a whole alerts the magistrate to the
potential credibility issues with Jordan.

    The same is true for any omissions regarding
Jordan's suspected involvement in the crime.  The fact
that Tomes included the fact that Jordan was <u>Mirandized</u>
and his van was used in the crime is sufficient to alert
the magistrate to any lack of credibility on Jordan's
part.  <u>See</u> <u>Johns</u>, 948 F.2d at 606 ("The government need
not include all of the information in its possession to
obtain a search warrant."); <u>United States v. Ellison</u>,
793 F.2d 942, 947 (8th Cir. 1986) (affiant's omission
that several informants were in jail and had received
financial consideration from the government, did not
undermine informant's information or cast doubt on
probable cause).  Therefore, there is no material
omission, let alone an omission sufficient to remove

probable cause.  Additionally, there is no substantial showing that this omission was deliberate or reckless.[6] See United States v. Colkley, 899 F.2d 297, 301-302 (4th Cir. 1990) (finding that the court could not infer intent or recklessness from the fact of omission itself, otherwise it would collapse the two distinct elements of "intentionality" and "materiality" into one element). See Chavez-Miranda, 306 F.3d at 979 (finding that bare assertions that the omissions were reckless or intentionally misleading fall short of the preponderance of the evidence that Franks requires.").

Lastly, Defendant cannot make the requisite showing in regards to Jordan's inconsistent statements about selling his van to Defendant, his inconsistent descriptions of the purchaser of his van, and his initial identification of another person as the purchaser of the van.

The Government argues that despite Jordan's inconsistent statements, he consistently stated that Defendant was present at the sale of his van.  Despite

---

[6] The only specific allegation is the statement that Tomes refers to the confidential informants and witnesses by different names to hide the statements they make that are inconsistent and incriminating toward one another.  However, there is no specific evidence that Tomes reported anything other than the name or nickname as reported by the witnesses or informants.

having initially provided varying descriptions of the
purchaser and tentatively selecting the photograph of
another, Jordan did ultimately identify Defendant as the
purchaser of his van.  This was collaborated by CW-2.
Additionally, it was reasonable for the detective to
determine that these inconsistencies were more akin to
false exculpatory information[7] or motivated by fear.[8]
The Government's argument is reasonable because Tomes
could have determined that the prior inconsistent
statements were false and/or not relevant to the
probable cause determination, especially in light of
other collaborating information.  Courts have found that
negligent omission does not rise to the level of
deliberate or reckless.  Colkley, 899 F.2d at 301-02.
Additionally, the court should not "infer[] intent or
recklessness from the fact of omission itself."  Id.

     Regardless of whether a material omission was made,
Defendant has not shown that the omission is necessary
for a finding of probable cause.  For an omission to

---

     [7] "…the affirmative inclusion of false information in an
affidavit is more likely to present a question of impermissible
official conduct than a failure to include a matter that might be
construed as exculpatory.  This latter situation potentially
opens officers to endless conjecture about investigative leads,
fragments of information, or other matter that might, if
included, have redounded to defendant's benefit." Colkley, 899
F.2d at 301.

     [8] The Government asserts that Jordan consistently stated his
fear of the Hoovers.

serve as the basis for a hearing under <u>Franks</u>, Defendant must show "that the affidavit … supplemented by the omissions would not be sufficient to support a finding of probable cause." <u>Stanert</u>, 762 F.2d at 782.  If the information regarding Jordan's inconsistent statements were submitted in the affidavit, it would not have changed the fact that there was probable cause.  The affidavit includes information from CI-I, a professed member of the Hoovers and one of its robbery crews, that Johnson was part of the robbery.  It also includes information from CW-1 and CW-2 that Defendant helped plan the robbery.  <u>See also</u> <u>United States v. Meling</u>, 47 F.3d 1546, 1555 (9th Cir. 1995) (explaining that when other information supports a finding of probable cause, an informant's low credibility is inconsequential).

Therefore, Defendant should not be granted a <u>Franks</u> hearing on the basis of any omissions made concerning Larry Jordan.

        2.  <u>CI-1</u>

    Defendant argues that the statements provided by CI-1 are misleading because the Government failed to provide information concerning CI-1's criminal history, that CI-1 committed other bank robberies in robbery crews that did not include Defendant, he denied any involvement in the crime at issue, he gave a false alibi

24

as to his whereabouts during the robbery, and he has
been implicated in the robbery at issue.  As a result,
he argues, the statement that CI-1 is "currently

assisting the FBI and U.S. Attorney's Office in solving
bank robberies committed by members of his robbery crew"
is misleading because it omits critical facts about CI-
1's credibility.

   In its totality, the affidavit would not mislead
the magistrate into thinking that CI-1 was unbiased and
credible.  The affidavit states that CI-1 is a member of
the Hoovers, conducted armed robberies, and served as
the crew leader for a robbery crew.  [Tomes' Aff. ("Ex.
1") at 8].  See also United States v. Furlong, 844 F.
Supp. 624, 628 (D. Mont. 1994) (finding "it is
reasonable to conclude that law enforcement assumed that
the [magistrate] would have supposed that the informant
had an ulterior motive, such as a reward, for turning in
the information; United States v. Strifler, 851 F.2d
1197, 1201 (9th Cir. 1988) (finding that magistrate
would naturally have assumed that informant was not a
disinterested citizen).  More importantly, these
omissions would not have effected the probable cause
determination because the magistrate was already
apprised that CI-1 had a criminal history from the facts
given about CI-1's membership in the Hoovers.  Lastly,

25

1  ///

2  ///

3  Defendant makes no allegation that these omissions were

4  done knowingly or intentionally to mislead.[9]

5

6       Defendant is correct that Jordan, CW-1, and CW-2

7  implicated CI-1 in the robbery.[10]  However, this is not

8  clear on the face of the affidavit because CI-1 is not

9  named as Day Day.  Therefore, the magistrate could not

10 have made an accurate assessment of CI-1's credibility.

11

12      However, adding this information would not change

13 the probable cause determination for two reasons.

14 First, CI-1's statements were collaborated by CI-2.  See

15 Meling, 47 F.3d at 1555 (explaining that when other

16 information supports a finding of probable cause, an

17 informant's low credibility is inconsequential); United

18 States v. Landis, 726 F.2d 540, 543 (9th Cir. 1984)

19 (interlocking tips from different confidential

20

21 _____

22      [9] Moreover, Defendant's assertion that CI-1's statement
   about committing multiple robberies without Defendant was a
23 material omission is without merit.  The affidavit states that
   CI-1 stated he did not associate with Defendant and that he
27 committed other robberies.  This is sufficient to infer that
   Defendant has committed other robberies without Defendant.  See
28 United States v. Johns, 948 F.2d 599, 606 (9th Cir. 1991) (The
   government need not include all of the information in its
   possession to obtain a search warrant).

      [10] They implicated "Day Day" which is CW-1's gang moniker.

26

informants enhance the credibility of each).[11]
Additionally, the court should not "infer[] intent or
recklessness from the fact of omission itself."  Id.
Lastly, the purpose of CI-1's statement was to establish
that Defendant was a member of the Hoovers and known as
a "shooter".  CI-1 did not make any statement that
Defendant was involved in the crime at issue.
Therefore, any credibility issue with CI-1 because of
his implication in the crime at issue would not be as
relevant or as important if the information he provided
directly implicated Defendant in the robbery at issue.

     Therefore, Defendant should not be granted a Franks
hearing on the basis of any omissions made concerning
CI-1.

          3.  CI-2
     Defendant argues that Tomes made misleading
omissions in regards to CI-2's criminal history,
included a false statement that CI-2 identified
Defendant as a "shooter" in the gang, and misled
theCourt by stating that Defendant was part of the
gang's robbery crew, when in reality there are multiple
///

---

[11] See Colkley, 899 F.2d at 301-02.

1 ///

2 ///

3

4 robbery crews.[12] [13]

5

6    Defendant's argument about omissions regarding CI-

7 2's criminal history lacks merit for the same reasons

8 explained above in regards to Jordan and CI-1.   Tomes

9 stated that CI-2 was a member of the Hoovers, conducted

10 armed robberies, and served as the crew leader for a

11 robbery crew. [Ex. 1 at 8-9].

12

13    Defendant's allegation that Tomes included a false

14 statement that CI-2 identified Defendant as a "shooter"

15 in the gang is also unpersuasive.   Tomes states in her

16 affidavit that her information from CI-2 is based on

17 information provided by Detective O'Donnell and

18 Jaramillo.  [Ex. 1 at 8].  Attached to the Government's

19 Opposition as Exhibit C is O'Donnell's notes from his

20 interview with CI-2.   In those notes, CI-2 identifies

21

22    [12] Shooters are "gang members who are known to have

23 committed murders or attempted murders with firearms for the
gang."

27    [13] Defendant also requests that this Court order the

28 Government to reveal CI-2's true identity.   This is denied
because the Government states that it already disclosed this
information under seal on August 11, 2008 and served defense with
a copy. [See CR 482 Individual #3; Ex. D to Yang Decl.).

Defendant as a "shooter."   [Ex. C at 3].   The apparent
confusion comes from the fact that Special Agent Mike
Haluahni, who was present at that same interview, did
not include this information in his report.   However,
Tomes did not include a false statement in her report as
shown by O'Donnell's notes.

Lastly, Defendant argues that Tomes' statement that
CI-2 was part of "the gang's robbery crew" was
misleading because it suggests that the "Hoovers have
only one robbery crew" instead of multiple crews.   Thus,
he argues, this would have weighed against a probable
cause finding because it implies that CI-2 and Defendant
were part of the same robbery crew, when really there
were multiple crews.

This argument also fails because Tomes' affidavit
states that the Hoovers have smaller "sets," "factions,"
or "cliques," some of which "form robbery crews."
Therefore, the magistrate was alerted to the fact that
there are multiple robbery crews within the Hoovers.
Defendant has not made a showing that Tomes' made this
statement intentionally or in reckless disregard for the
truth in light of the fact that Tomes clearly explained
there were multiple robbery crews.   Changing the
affidavit to include this information might lessen
probable cause to the extent that the magistrate might

infer that if there is only one crew it was the one

responsible, but it would not negate probable cause

because CI-2's statement was provided to show that CI-2

knew Defendant was in one of the robbery crews, not that

they were in the same crew, the Hoover's only crew, or

Defendant was in a specific crew.

     4.  <u>CW-1</u>

Defendant argues that Tomes' omitted the fact that

CW-1 came forward after a reward was offered, the murder

was public knowledge, the police were not looking for

someone in a charger's jacket, and $300,000 was not the

correct amount stolen.  Additionally, Defendant omitted

CW-1's criminal history.

In regards to any alleged omissions, Defendant does

not make a substantial showing that any omitted facts

were intentionally or recklessly omitted to mislead the

magistrate.  To begin, the magistrate would not have

been misled about $300,000 being the incorrect amount

stolen because Tomes' states in the affidavit that

$436,000 was stolen.  [Ex. 1 at 6].  Additionally, it is

apparent from the affidavit that the crime was public

knowledge because Tomes states that CW-1 told her she

saw a press conference about the murder on television.

[Ex. 1 at 10].  Furthermore, there is no allegation,

other than the omission itself, that Tomes'
intentionally or recklessly omitted this information.
See Chavez-Miranda, 306 F.3d at 979 (finding the
defendant's allegation of that affiant had a pattern of
deliberate omission, without specific evidence, was
insufficient to support claim that affiant recklessly or
intentionally misled the court); Colkley, 899 F.2d at
301-02 (finding that the court could not infer intent or
recklessness from the fact of omission itself, otherwise
it would collapse the two distinct elements of
"intentionality" and "materiality" into one element).

In actuality, Defendant's primary argument is that
the information provided by CW-1 was hearsay and public
knowledge, and therefore unreliable.  However, this is
not sufficient to entitle Defendant to a Franks hearing
because "the veracity of only the affiant [may] be
challenged."  United States v. Perdomo, 800 F.2d 916,
920 (9th Cir. 1986); United States v. Staves, 383 F.3d
977, 983 (9th Cir. 2004).  This argument challenges the
veracity of CW-1.

Therefore, Defendant is not entitled to a Franks
hearing based on any omissions in regards to CW-1.
///

5.  CW-2

Defendant states that the affidavit falsely represents that CW-2 heard the planning of an "armored truck robbery" as opposed to the originally reported "bank or truck robbery."  Defendant argues that this is significant because during this time there were multiple robberies, and it is believed that CW-2's statement shows she overheard the planning of a different robbery in question.  Defendant supports this argument by stating that in CW-2's first interview she identified four individuals as planning a bank or truck robbery. In the next interview, several months later, CW-2 identified two additional persons, not originally named, as present at the planning meeting.  One of these persons included Defendant.  Defendant argues this is significant because Tomes was aware of the fact that there was another armed robbery of a bank one week earlier to the crime at issue, in which two of the persons CW-2 identified were involved.  Therefore, if this information was included, the magistrate would have realized CW-2 was unreliable as to who was present at the meeting and what crime was being discussed.

Defendant's argument fails for several reasons. First, Defendant is incorrect that CW-2 did not identify Defendant in the first interview.  Although, not included in Tomes' affidavit, according to the Government, Special Agent Stephen May's notes show that

CW-2 identified Defendant in that meeting.[14]   [Yang Decl. Ex. J].

Defendant's next claim about Tomes making a false allegation that CW-2 overheard the planning of the "armored truck robbery" when Detective O'Donnell's interview report states that CW-2 overheard the planning of a "bank robbery or a truck robbery," also fails. Defendant has not alleged facts to show that this was a deliberate or reckless omission.  He only argues that in the context of another similar crime at the time, this is significant because it is impossible to conclude the robbery being discussed was the robbery at issue in this case.  Whether CW-2 said bank robbery, truck robbery, or armored truck robbery, in the context of CW-2's statement it was not unreasonable for Tomes to conclude that this was the armored truck robbery at issue.[15]  This is true, especially since CW-2 said that she heard about the murder and knew the Hoovers were involved.  See United States v. Senchenko, 133 F.3d 1153, 1158 (9th Cir. 1998) (finding there was no reckless falsity unless high degree of awareness of probable falsity).

_____

[14] It is difficult to discern the May's handwriting; however, the words "OK was…" are legible.  "OK" is Defendant's gang moniker.  Therefore, there is no false statement.

[15] Especially since it was an armored truck robbery at a bank.  The distinction between the term armored truck and truck is negligible.

Therefore, Defendant is not entitled to a <u>Franks</u> hearing on the basis of CW-2's statements.

For all the reasons stated above, Defendant has not met his burden to entitle him to a <u>Franks</u> hearing.

5. <u>Defendant Johnson's Motion to Suppress Evidence Obtained as Result of Service of Search Warrant Obtained in Violation of Rule 41 of the Federal Rules of Criminal Procedure [624]</u>

Defendant Johnson's Motion to Suppress Evidence Obtained as a Result of Service of Search Warrant Obtained in Violation of Rule 41 is **DENIED.**

"The mere fact that evidence obtained by state officers, under a state warrant, based upon violations of state law, is used in a federal prosecution does not invoke the requirements of Rule 41." <u>United States v. Crawford</u>, 657 F.2d 1041, 1046 (9th Cir. 1981). However, if the search is "federal in character" then the "provisions of Rule 41 designed to protect the integrity of the federal courts or to govern the conduct of federal officers" apply. <u>Id</u>. "...A search is federal if from the beginning it was assumed a federal prosecution would result." <u>United States v. Palmer</u>, 3 F.3d 300, 303 (9th Cir. 1993).

If the Government violates Rule 41, then Court must suppress the evidence if the violation is "fundamental." United States v. Johnson, 660 F.2d 749, 753 (9th Cir. 1981). "A violation is 'fundamental' only where it, in effect, renders the search unconstitutional under traditional fourth amendment standards." Id. Where the alleged violation is not fundamental, suppression is mandated only if "(1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." United States v. Radlick, 581 F.2d 225, 228 (9th Cir. 1978) (internal citation omitted).

In Palmer, 3 F.3d at 303, the Ninth Circuit found that a search conducted pursuant to a state search warrant was not federal in character where state officers initiated the investigation and merely provided information to the federal government, and the federal government had no intent to prosecute the case before the search occurred. The Court in Palmer distinguished the facts from Crawford because local officials initiated and controlled the investigation.

A.   Defendant Has Not Met his Burden to Show that the Search Was "Federal" in Character

Based on the evidence submitted thus far, the Court finds no evidence showing that "from the beginning it was assumed a federal prosecution would result."[16]   The facts show the LAPD processed the scene, collected the physical evidence, and conducted almost all of the forensic analysis.   [Opposition at 31; Ex. A]. Although the Government had some level of participation initially, it appears that early on the investigation diverged as the Government's primary goal was investing the Rolling 30's for other armed robberies, while LAPD pursued the crime at issue.[17]   This is supported by the Government's lack of participation in obtaining or executing the search warrant, and the evidence submitted of the LAPD's primary role in investigating the crime at issue.[18]

---

[16] The Government states that this case did not become federal until the LAPD received a "cold hit" from DNA collected from the crime scene matching Defendant Williams, three days after the search at issue.  After that time, the Government sought all search warrants from the federal magistrate, thus collaborating that the case did not go federal until this time. The Government argues that "no decision to pursue a federal prosecution was ever made until after the "cold hit…" [Opposition at 34].

[17] The Government and LAPD continued to share information regarding these investigations.  The Government supports this contention by showing that all of the federal search warrants at this time were for the Rolling 30's in regards to other robberies, while all the warrants secured relating to the crime in this case were secured by the LAPD.

[18] The LAPD obtained and executed the search warrant without any federal participation.

Nevertheless, the Court is mindful of Defendant's argument that he has information leading him to believe that the LAPD detectives were deputized federal agents, either prior to or during the investigation, and that there is evidence of extensive meetings between Federal prosecutors and LAPD detectives.  However, at this time there is no evidence that the investigation was "federal in character" and without further facts to substantiate these claims, this Motion is **DENIED WITHOUT PREJUDICE.**

    B.   <u>Regardless of Whether the Search was "Federal,"</u>
<u>the Evidence from the Search Warrant Should Not</u>
<u>be Suppressed</u>

Even assuming the search was "federal," the evidence should not be suppressed because there was no fundamental violation, prejudice, or evidence of intentional and deliberate disregard of a provision in Rule 41.  <u>Radlick</u>, 581 F.2d at 228.

Defendant's argument is that the Government violated Rule 41 because the search warrant was issued by a state judge at the request of the LAPD, as opposed to application by a federal officer to a federal magistrate.  Additionally, the return was not made to a federal magistrate and the warrant failed to allege that a federal crime was committed.  [Motion at 5].

37

Defendant is correct that the Government violated Rule 41.

### 1.   There Was No "Fundamental" Violation

Defendant argues that the violation of Rule 41 mandates suppression because the violation was fundamental in that the affidavit supporting the search warrant contained material misrepresentations and omissions that if corrected fail to establish probable cause.  This argument is set forth in Defendant's Motion to Traverse Search Warrant.  As concluded in that Order, the search warrant had probable cause, and thus no fundamental violation.

///
///
///
///

### 2.   There is No Prejudice Because the Search Would Still Have Occurred if Rule 41 Had Been Followed

Defendant explains that when the Government sought wiretap applications in federal court, it advised the judge of the various inconsistent statements of Larry Jordan and his criminal history, unlike the affidavit to the superior court magistrate.  As a result, he argues,

if the Government had done the same for the warrant at
issue in federal court, the federal magistrate would not
have found probable cause.

Defendant's argument fails because, as explained in
the Order for Defendant's Motion to Traverse Search
Warrant, these statements were not material omissions
and there was still probable cause even if they were
submitted to the superior court magistrate.  See United
States v. Ritter, 752 F.2d 435, 441 (9th Cir. 1985)
(finding no prejudice where state magistrate issued
search warrant because there was "no indication that a
federal magistrate would have handled the search warrant
application differently than did the state judge.").
Additionally, Defendant's argument is undermined because
he states that the federal judge found probable cause to
grant an application for a wiretap, even after the

Government explained Jordan's inconsistent statements
and prior criminal history.

> 3.   There is No Evidence of Intentional and
>       Deliberate Disregard of Rule 41

Defendant argues that the Government must have
deliberately and intentionally disregarded Rule 41
because given the misrepresentations and omissions in
the affidavit, the federal officers would not have

wanted to risk their reputation and credibility by presenting a misleading affidavit to a federal judge or magistrate.  Therefore, they "made an end run around the rule" by sending local police to the state magistrate, who were unfamiliar with the investigation.  [Motion at 10].

Again this argument fails because there was probable cause for the search warrant with or without the alleged omissions and misrepresentations.  Additionally, this speculation is insufficient to show that the Government deliberately and intentionally disregarded Rule 41.[19]

There being no "fundamental" violation of Rule 41, prejudice, or deliberate and intentional disregard of Rule 41, any evidence obtained from the search should not be suppressed.  Defendant's Motion is **DENIED WITHOUT PREJUDICE.**

6.  <u>Defendant William's Motion to Exclude DNA Test Results and Request for Daubert Hearing [609]</u>

Defendant Williams' Motion to Exclude DNA Test Results and Request for Daubert Hearing is **DENIED**. However, this Order does not apply to Defendant's

_____

[19] This is based on the evidence presented to the Court at this time and will be reconsidered in a renewed Motion if Defendant can assert proof to the contrary.

1  argument that the Government conducted "Low Copy Number"

2  testing on both DNA samples found to match Defendant.

4  A.   Legal Standard Under Daubert and Rule 702

6  Federal Rule of Evidence 702 provides that "if

7  scientific, technical or other specialized knowledge

8  will assist the trier of fact to understand the evidence

9  or to determine a fact in issue," an expert "may testify

10  thereto."  Fed. R. Evid. 702.  In order for scientific

11  evidence to be admissible under Rule 702 and Daubert,

12  the Court must find that the testimony is reliable.   To

13  make this determination the court must assess (1)

14  whether the theory or technique can be and has been

15  tested; (2) whether the theory or technique has been

16  subjected to peer review and publication; (3) the known

17  or potential rate of error of a particular scientific

18  technique and the existence and maintenance of standards

19  controlling the technique's operation; (4) whether the

20  technique is generally accepted.  Daubert v. Merrell Dow

21  Pharms., 509 U.S. 579, 593-594 (1993).  "The focus []

22  must be solely on principles and methodology, not on the

23  conclusions that they generate.  Id.

28  B.   Analysis of PCR/STR Testing Under the Daubert
          Factors

   1.   Whether the Theory or Technique Can and Has

41

<u>Been Tested</u>

Defendant does not seem to contest the fact that PCR/STR testing can and has been tested.  In <u>United States v. Ewell</u>, the District Court of New Jersey found, "There is little doubt that [PCR-STR DNA typing] has a testable hypothesis. 'The hypothesis of PCR/STR DNA typing [utilizing Profiler Plus and Cofiler] is that with proper procedures an expert can determine the allelic types of given DNA samples at the thirteen core STR loci.' . . . [T]his hypothesis can be tested by any laboratory with the proper equipment to perform the PCR process." <u>United States v. Ewell</u>, 252 F. Supp. 2d 104, 111 (D.N.J. 2003) (quoting <u>United States v. Trala</u>, 162 F. Supp. 2d 336, 346 n. 11 (D. Del. 2001).  Moreover,

this is further supported by the extensive peer review that this method has received (as explained below). Thus, this factor of the <u>Daubert</u> test weighs in favor of admissibility.

      2.  <u>Peer Review and General Acceptance in the Scientific Community</u>

Courts have consistently found that PCR/STR testing has not only been extensively peer reviewed, but is also

generally accepted in the scientific community.[20]  In
United States v. Morrow, 374 F. Supp. 2d 51, 61 (D.D.C. 2005), the D.C. Court of Appeals found that "Given the weight of [judicial] authority, … as a general matter, PCR/STR DNA testing meets the strictures of Daubert and is admissible."  Based on the above and evidence to the Court, the Court finds that PCR/STR testing is properly peer reviewed and generally accepted in the scientific community.  This Court does not need a Daubert hearing to conclude what countless other courts have virtually unanimously agreed upon.

Defendant attempts to distinguish the DNA testing in this case because it involves the Profiler Plus and COfiler kits.  However, this argument fails for several reasons.  First, many courts in other jurisdictions have concluded that these kits are sufficiently peer reviewed and generally accepted in the scientific community.  See People v. Smith, 107 Cal. App. 4th 646, 665 (Cal. App. 2d Dist. 2003) (listing numerous validation studies in peer-reviewed journals for Profiler Plus and COfiler, and finding they are sufficiently accepted in the

---

[20] See Ewell, 252 F. Supp. 2d at 111 (finding PCR/STR testing reliable under Daubert); Trala, 162 F. Supp. 2d at 347, aff'd 386 F.3d 536, 542 (3d Cir. 2004) (same); and United States v. Wright, 215 F.3d 1020, 1027 (9th Cir. 2000) (finding PCR satisfied Daubert); People v. Jackson, 77 Cal. Rptr. 3d 474, 481 (Cal. Ct. App. 2008) (finding PCR/STR generally accepted in scientific community, as well as capillary electrophoresis).

scientific community); <u>Ewell</u>, 252 F. Supp. 2d at 111 (same).


Second, the Court does not need to undergo a <u>Daubert</u> analysis if the only subject of review is a new PCR/STR test kit.  In <u>People v. Hill</u>, 89 Cal. App. 4th 48 (Cal. App. 2d Dist. 2001), the court found that each new PCR/STR test kit need not, as a matter of law, be subjected to an analysis to determine scientific reliability as long as it complies with PCR/STR methodology.  <u>See also</u> <u>People v. Jackson</u>, 77 Cal. Rptr. 3d 474, 482 (Cal. App. 3d Dist. 2008).  Here, Defendant has not suggested that the Profiler Plus or COfiler kits do not comply with general PCR/STR methodology.  The only distinction between the Profiler Plus and COfiler kits and other test kits already subject to <u>Daubert</u> analysis is that the Profiler Plus and COfiler kits analyze more loci than prior testing kits.  The PCR/STR methodology remains the same as the other test kits.  In fact the only difference is that the Profiler Plus and Cofiler are more accurate because they analyze more loci.


          3.  <u>The Known or Potential Rate of Error of a</u>
<u>Particular Scientific Technique</u>

According to evidence submitted by the Government, FBI standards, and other case law, the known potential

rate of error for PCR/STR testing is virtually zero.
The Government has submitted the declaration of
Charlotte Word, a forensic DNA consultant and former
Laboratory Director at Orchid Cellmark who has testified
in over 250 cases.  Word states that when proper
procedures are employed, PCR/STR testing will
"generate[] results that may always be relied upon as
accurate." [Word Decl. ¶ 22].  In Morrow, the Court
found that "... if an analyst follows the FBI protocol
and uses properly calibrated instruments, there is
essentially zero rate of error, i.e., obtaining a wrong
result, within established measurement conditions."
Morrow, 374 F. Supp. 2d at 67.  The LAPD SID follows the
FBI Standards.[21]  [Word Decl. ¶ 17].  Therefore, this
factor favors admissibility.

     The rate of error described above excludes any
potential human error.  Daubert concerns the methodology
of the scientific evidence, and is not normally
concerned with human error in applying the methodology.

---

[21] The Quality Assurance Standards for DNA Testing ("QAS")
superseded the standards drafted by Congress and are considered
authoritative by the forensic testing community.  These standards
were adopted by the FBI.  In order to upload DNA profiles into
CODIS, the FBI's DNA database, at a national level, a lab must
follow the FBI's standards and be accredited by ASCLD/LAB [Decl.
Word at 16-17].  LAPD SID is accredited by ASCLD and is
authorized to upload DNA profiles into CODIS at the national
level.  [Id. at 17; Attachment 4: Certificate of Accreditation].

45

According to some Circuits, <u>Daubert</u> only excludes
evidence in such a case where the methodology "was so
altered [by a deficient application] as to skew the
methodology itself.'" <u>United States v. Beasley</u>, 102
F.3d 1440, 1448 (8th Cir. 1996).[22]  Here, Defendant
presents arguments that the DNA evidence should be
inadmissible because the Government has failed to
include in its statistical computation an estimate of
the lab error rate and has failed to apply reliable
scientific procedures.  The argument regarding the lab
error rate reflects a "fundamental misunderstanding of
the principles of <u>Daubert</u>. The Court's concern under
Rule 702 and <u>Daubert</u> is the reliability of the
scientific methodology at issue, not the reliability of
the laboratory performing the test." <u>Morrow</u>, 374 F.
Supp. 2d at 67.  Thus, such challenge to the lab's error
rate, actually "challenge[s] the proficiency of the
tester rather than the reliability of the test. Such
challenges go to the weight of the evidence, not its
admissibility." <u>Id.</u>

---

[22] The Ninth Circuit has not articulated this test, but
others circuits have adopted this standard.  Although, it is
arguable that under a broad reading of <u>United States v.
Chischilly</u>, 30 F.3d 1144, 1154 (9th Cir. 1994), the Ninth Circuit
has implicitly rejected analyzing any application of a scientific
method under <u>Daubert</u>.  In <u>Chischilly</u>, the court found that in
light of <u>Daubert</u>, "the impact of imperfectly conducted laboratory
procedures might therefore be approached more properly as an
issue not going to the admissibility, but to the weight of the
DNA profiling evidence."

Human error in testing for this particular case might only render the evidence inadmissible if "the methodology "was so altered [by a deficient application] as to skew the methodology itself.'" Beasley, 102 F.3d at 1448. See also Morrow, 374 F. Supp. 2d at 68. In Morrow, the defendant's claims of sample mishandling were not sufficient to exclude the evidence under Daubert. The Court stated, "If actual or potential human errors do not rise to this level, they simply go to the weight of the DNA evidence proffered." Id. ///

Here, Defendant alleges various errors in the lab procedures, but he has not alleged any specific error in the testing for this case. These arguments are relevant to assess the weight of the evidence, but not its admissibility. For example, in United States v. Hicks, 103 F.3d 837, 846 (9th Cir. 1996), the Court found that claims about likelihood of contamination go to weight, not admissibility.[23]

[23] See also United States v. Chischilly, 30 F.3d 1144, 1153-54 (9th Cir. 1994) ("potential faults in the DNA sample extraction processes … go to the weight to be accorded the evidence, not its admissibility…"); United States v. Jakobetz, 955 F.2d 786, 800 (2nd Cir 1992) (finding with regard to DNA profiling the "district court should focus on whether accepted protocol was adequately followed in a specific case, but the court, in exercising its discretion, should be mindful that this issue should go more to the weight than to the admissibility of the evidence."); and Trala, 162 F. Supp.2d at 349 (challenge to

Moreover, Defendant does not make any specific allegations of improper procedures applied in the testing done in his case.  Instead he makes various arguments about the procedures followed by the lab, in general.[24]  As shown above, the LAPD SID follows the FBI Standards.  These Standards are and have been determined as reliable.  There is no evidence that accepted protocol was inadequately followed in this case.  While, Defendant cites other standards that may very well be more cautious, this is not sufficient to deem the method employed here as unreliable.  Instead, any allegations of improper procedures should go to the weight of the evidence and be further explored on cross-examination or expert witness testimony.  See also Chischilly, 30 F.3d

---

allelic dropout, among other things, goes to the weight of evidence, not its admissibility); United States v. Beasley, 102 F.3d 1440, 1448 (8th Cir. 1996) (argument that DNA testing required special procedures that lab did not observe, double blind external tests to check results, and frequent external proficiency testing of analysts, went to weight, not admissibility).  These courts have found that the weight of evidence could be attacked on cross examination or by other expert testimony.

[24] Defendant's argument that proper protocol was not followed is based on standards established by the National Research Counsel, TWGDAM Guidelines, and DAB standards.  However, Word's Declaration explains that TWGDAM and DAB standards were superseded by the FBI Standards.  LAPD SID follows the FBI Standards.  The Government has made a preliminary showing that they follow these standards.  Without more specific allegations, there is no evidence that LAPD was not following a proper set of procedures.

48

at 1154 ("With regard to admissibility, the mere existence of scientific institutions that would interpret data more conservatively scarcely indicates a 'lack of general acceptance' under Daubert...").[25]

Therefore, this Court **DENIES** Defendant's Motion to exclude the evidence derived from the Government's use of PCR/STR testing and use of the Profiler Plus and COfiler kits.  Moreover, this Court **DENIES** Defendant's request for a <u>Daubert</u> hearing because the Court is not required "to conduct a pre-trial evidentiary hearing if the expert testimony is based on well-established principles."  <u>United States v. Cooper</u>, 91 F. Supp. 2d 79, 82 (D.D.C. 2000) (citing <u>United States v. Nichols</u>, 169 F.3d 1255, 1263 (10th Cir.).

    C.   <u>Daubert and Rule 702 Challenges to the Statistics Associated with a "Cold Hit" DNA Case</u>

Defendant argues that any testimony about the random match probability or likelihood ratio statistics set forth in the LAPD SID report is inadmissible because the use of such statistical devices in a "cold hit" case is

---

[25] Moreover, some of Defendant's allegations are unfounded. For example, states that LAPD is unaccredited.  The Government has provided its certification of accreditation, attached as Exhibit 4 to the Decl. of Word.

unreliable and not generally accepted in the scientific community.

The likelihood ratio approach or a random match probability approach are often used in probable cause cases, in which DNA from a crime scene is compared directly to the DNA profile of a *known* suspect.  If the suspect's profile matches the crime scene profile, then a calculation is performed to determine the statistical significance of a match between the two profiles.  This calculation is completed using the "product rule."  The product rule takes the expected frequencies of the set of markers (alleles) at a discrete, identified set of locations (loci),  from the evidence profile and multiplies those frequencies together to get the random match probability ("RMP") for that profile.  The RMP represents the chance that a single randomly selected unrelated individual would match the evidence profile by coincidence.  The RMP also represents the rarity of a particular DNA profile in the population.

In contrast, a "cold hit" case arises when the DNA profile from a crime scene is not compared to a *known* suspect; but rather, to DNA profiles in a computer database.  Defendant argues that the RMP in a cold hit case does not properly calculate the likelihood that a coincidental erroneous match has occurred.  In simpler

terms, the chance of a coincidental match is elevated in a cold hit case.  Thus, in a cold hit case,

> [T]he product rule derived number no longer accurately represents the probability of finding a matching profile by chance.  The fact that many profiles have been searched increases the probability of finding a match.  Instead, the 'database match probability' more accurately represents the chance of finding a cold hit match.

United States v. Jenkins, 887 A.2d 1013, 1018 (D.C. 2005).  Importantly, the statistic representing the rarity of the DNA profile remains unchanged in a cold hit case.  Id. at 1018 n.7.  Therefore, the issue

becomes whether expressing the rarity statistic is sufficient to meet Daubert and Rule 702.[26]

The real issue ultimately concerns a relevance inquiry rather than a Daubert analysis.  Daubert focuses solely "on principles and methodology, not the conclusions that they generate."  Daubert, 509 U.S. at 593.  The final stage in PCR/STR testing is statistical calculation to express the significance of the DNA match.  Use of the product rule to calculate the rarity statistic easily meets the standards of Daubert.  There is no argument, nor does Defendant argue otherwise, that the method in calculating the rarity statistic is

---

[26] Daubert applies to each stage of the DNA testing.  The final stage is statistical calculation to express the significance of the DNA match.

unreliable.   The issue is whether the rarity statistic
has any relevance without the random match statistic.
As the DC Court of Appeals and the California Supreme
Court found, this is an issue of relevance, not
methodology.   <u>United States v. Jenkins</u>, 887 A.2d 1013,
1023-1024 (D.C. 2005); <u>People v. Nelson</u>, 43 Cal. 4th
1242, 1263-1264 (2008) (finding that the use of the
product rule in a cold hit case is not the application
of a new scientific technique subject to further Kelly
(or Kelly-like) test).   This Court adopts the reasoning
of <u>Jenkins</u> which states:

> At the heart of this debate is a disagreement over the
> competing questions to be asked, not the methodologies
> used to answer those questions. The rarity statistic,
> the database match probability, and the Balding-
> Donnelly approach each answer unique and potentially
> relevant questions.   More importantly, there is no
> controversy in the relevant scientific community as to
> the accuracy of the various formulas. ... The rarity
> statistic accurately expresses how rare a genetic
> profile is in a given society.   Database match
> probability accurately expresses the probability of
> obtaining a cold hit from a search of a particular
> database.   Balding-Donnelly accurately expresses the
> probability that the person identified through the
> cold hit is the actual source of the DNA in light of
> the fact that a known quantity of potential suspects
> was eliminated through the database search. ...
> Instead, the arguments raised by each of the
> proponents simply state that their formulation is more
> probative, not more correct.

<u>Jenkins</u>, 887 A.2d at 1022-1023.   Thus, there is no issue
under <u>Daubert</u> because the Government intends to use the

1    rarity statistic to express how rare the genetic profile

2    is in a given society.[27]

3

4    Additionally, the rarity statistic is clearly

5    relevant because it informs the jury about how rare the

6    DNA profile is in a population and thus how likely it is

7    that someone other than Defendant was the source of the

8    evidence.

9

10   Therefore, Defendant's request for a <u>Daubert</u> hearing

11   to challenge to the statistics associated with this

12   "cold hit" case is **DENIED.**

13

14   D.    <u>The FBI's Population Estimates are an Accurate</u>
            <u>Expression of the Rarity of a Genetic Profile</u>

15

16   Defendant argues that improper restriction of

17   statistics to Caucasians, African-Americans, and

18   Southeast Hispanics renders any statistical probability

19   calculation inadmissible.

20

21   However, this assertion is untrue because LAPD SID

22   used population frequency estimates for ten distinct

23   populations.  [Opposition at 17; Exhibit D: Statistical

27   _____

28          [27]   The Government's expert will testify that "the
     combination of genetic marker types exhibited by the major DNA
     profile of Item # 141-A occurs in approximately 1 in 10
     quadrillion … unrelated individuals."  [Opposition at 55].

53

Reports].   LAPD SID used ten population frequencies, and
ultimately used the frequency from the ethnic group that
reflected the most common frequency (thereby favoring
Defendant).   Therefore, Defendant's argument is **DENIED**.


E.   Lab Error Rate


Defendant argues that LAPD SID has lab error rate
that should be used to adjust the population frequency
estimates used to assess the significance of the DNA
match.   This argument fails for two reasons.


First, Defendant has not alleged any lab error
specific to this case.   Second, the scientific community
has found that "a calculation that combines error rates
with match probabilities is inappropriate."   People v.
Reeves, 109 Cal. Rptr. 2d 728, 751 (Cal. Ct. App. 2001);
Roberts v. United States, 916 A.2d 922, 930 (D.C. 2007).
Therefore, Defendant's request is **DENIED**.


F.   Source Attribution Testimony


Defendant argues that the Government impermissibly
intends to use "source attribution" when presenting
expert testimony explaining the DNA test.


54

1      The Government responds that it does not intend to

2  give a source attribution.  Word's Declaration states

3  that the DNA report from Criminalist Mastrocovo states,

4      The DNA profile obtained from item #166 'Michael
       Williams' matches the major DNA profile obtained
5      from item # 141A (Analyzed Evidence Report dated
       6/15/04).  The combination of genetic marker types
6      exhibited by the major DNA profile of item #141A
       occurs in approximately 1 in 10 quadrillion
7      unrelated individuals.

8  This is not a source attribution statement.  Therefore,

9  Defendant's request is **DENIED WITHOUT PREJUDICE.**

10  ///

11  ///

12

13  G.  <u>Rule 901(b)(9)</u>

14

15      Defendant requests that this Court require the

16  Government to lay an adequate foundation before any of

17  its computer generated DNA evidence is admitted into

18  evidence.[28]  Specifically, Defendant cites Federal Rule

19  of Evidence 901(b)(9), and asks that the Court require

20  compliance with this rule.[29]

21

22      While Rule 901(b)(9) certainly describes one way to

23  ───────────────

27     [28]  Defendant describes the computer technology as a "black
    box" in that the technician feeds the sample in and the computer
28  generates a report.

     [29]  Rule 901(a) requires that evidence be properly
    authenticated.  Rule 901(b) lists examples of authentication that
    conform with the requirement of Rule 901.

authenticate the evidence at issue.  It is not a
mandatory rule for authenticating the type of evidence
at issue.  It specifically states that it is not to be
used "by way of limitation."  The Court should not
unduly restrict the Government in authenticating its
evidence.  The Government will have to properly
authenticate its evidence under Rule 901 in order for it
to be admitted.  If the Government fails to do so, then
Defendant can object accordingly.  Therefore,
Defendant's request is **DENIED**.


7. <u>Defendant Johnson's Motion to Adopt Co-Defendant's
   Motion to Exclude DNA Test Results and Request For
   Daubert Hearing [614]</u>

   To the extent applicable, the Court **GRANTS** Defendant
Johnson's Motion to Exclude DNA Test Results and Request
For Daubert Hearing.


8. <u>Defendant Williams' Motion to Join in Defendant
   Johnson's Request for Compliance with Court Order or
   Imposition of Sanctions for Continued Non-Compliance</u>

   Defendant Williams' Motion is **GRANTED.**

**IT IS SO ORDERED.**

_/s/_____

**HONORABLE RONALD S.W. LEW**

                              Senior, U.S. District Court Judge

DATED: December 23, 2008